# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| ADDISON HEMPEL, CASSIDY HEMPEL, CHRISTINE HEMPEL, and HUGH HEMPEL,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>CYDAN DEVELOPMENT, INC., CYDAN II, INC., VTESSE, INC., SUCAMPO PHARMACEUTICALS, INC., and MALLINCKRODT PLC,<br><br>　　　　　Defendants. | Case No. 18-cv-03404-PX<br><br>Honorable Judge Xinis<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................................ 1

BACKGROUND .................................................................................................................................. 3

A.  The Hempels Are the First in the World to Develop
a Cyclodextrin Protocol to Treat NPC in Human Beings. .................................................. 3

B.  Cydan Misappropriates the Hempels' Protected Material for Vtesse. .............................. 4

C.  NIH-Funded Researchers Misappropriate the Hempels' Data for Vtesse. ...................... 6

D.  Sucampo Acquires Vtesse for $200 Million and Subsumes Its Operations. ................... 8

ARGUMENT ....................................................................................................................................... 8

I.  THE HEMPELS HAVE STATED A CLAIM FOR BREACH OF CONTRACT. ........... 8

A.  The Hempels Have Alleged Enforceable Contracts with Cydan. .......................... 9

1.  The Confidentiality Agreement is Enforceable. ............................ 9

2.  An Implied Contract Governed the Business Plan. ....................... 13

B.  Vtesse Is Bound by Cydan's Contracts with the Hempels. ................................... 16

C.  The Confidentiality Agreement Does Not
Require Dismissal of Plaintiffs' Non-Contract Claims. ........................................ 17

II.  THE HEMPELS HAVE STATED
A CLAIM FOR VIOLATION OF CHAPTER 93A, § 11. ................................................. 17

A.  The Confidentiality Agreement
Does Not Preclude Application of Chapter 93A, § 11. .......................................... 17

B.  Cydan's Misconduct Occurred
"Primarily and Substantially" in Massachusetts. ................................................... 19

C.  The Hempels and Cydan were Engaged in the Conduct of Commerce. ............... 20

III.  THE HEMPELS HAVE STATED
COMMON LAW AND EQUITABLE CLAIMS. ............................................................. 22

A.  MUTSA Does Not Govern Plaintiffs' Claims Against Cydan. ............................. 22

B.  MUTSA Does Not Preempt the
Hempels' Claims Arising Under Maryland Law. ................................................... 23

C.  The Hempels Have Stated Common Law Claims. ................................................. 24

1.  The Hempels Have Stated a Claim for Breach of Fiduciary Duty. ........... 24

i

2.      The Hempels Have Stated a Claim for Unfair Competition.....................26

3.      The Hempels Have Stated a Claim for Unjust Enrichment......................27

4.      The Hempels Have Stated a Claim for Tortious Interference. ..................28

IV.     VTESSE, SUCAMPO, MALLINCKRODT, AND CYDAN II ARE LIABLE. ..............28

A.      Vtesse, Sucampo, and Mallinckrodt Knew or Should Have
        Known They Were Benefitting from Cydan's Misappropriation..............28

B.      Sucampo, Mallinckrodt, and Cydan II Are Liable as Successors. ............30

V.      LEAVE TO AMEND SHOULD BE FREELY GRANTED. ..........................................32

CONCLUSION ........................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Winters*,
   24 Nev. 143 (1897) .................................................................................................. 12

*Allstate Insurance v. Warns*,
   No. CCB-11-1846, 2012 WL 68179 (D. Md. Feb. 29, 2012) ................................... 23, 24

*American Legacy Foundation v. Lorillard Tobacco Co.*,
   831 A.2d 335 (Del. Ch. 2003) ................................................................................... 9

*Anisgard v. Bray*,
   419 N.E.2d 315 (Mass. App. Ct. 1981) ................................................................... 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................. 8

*Aware, Inc. v. Centillium Communications, Inc.*,
   604 F. Supp. 2d 306 (D. Mass. 2009) ..................................................................... 19, 21

*Bates v. Cottonwood Cove Corp.*,
   84 Nev. 388 (1968) ................................................................................................... 29

*Belmora LLC v. Bayer Consumer Care AG*,
   819 F.3d 697 (4th Cir. 2016) .................................................................................... 8

*Bergman v. Electrolux Corp.*,
   558 F. Supp. 1351 (D. Nev. 1983) ........................................................................... 14, 15

*Blake v. Professional Coin Grading Service*,
   898 F. Supp. 2d 365 (D. Mass. 2012) ...................................................................... 22

*Bommer v. American Spiral Spring Butt Hinge Manufacturing Co.*,
   81 N.Y. 468 (1880) ................................................................................................... 12

*Burbank Grease Services, LLC v. Sokolowski*,
   717 N.W.2d 781 (Wis. 2006) .................................................................................... 24

*Cargill, Inc. v. Beaver Coal & Oil Co.*,
   424 Mass. 356 (1997) ............................................................................................... 30

*Catlin Specialty Insurance Co. v. American Superconductor Corp.*,
   No. CIV.A. 12-2314-BLS1, 2014 WL 840693
   (Mass. Super. Ct. Jan. 29, 2014) .............................................................................. 18

*Cavicchi v. Koski*,
    855 N.E. 2d 1137 (Mass. App. Ct. 2006) ........................................................21

*Chartrand v. Barney's Club, Inc.*,
    380 F.2d 97 (9th Cir. 1967) ........................................................................12

*Chattery International, Inc. v. JoLida, Inc.*,
    No. CIV. WDQ-10-2236, 2012 WL 1454158 (D. Md. Apr. 24, 2012).....................22, 23

*Clinton Investors Co., II v. Watkins*,
    146 A.D.2d 861 (N.Y. App. Div. 1989) ...........................................................10

*Colgate-Palmolive Co. v. Carter Prods., Inc.*,
    230 F.2d 855 (4th Cir. 1956) ......................................................................29

*Commonwealth Land Title Insurance Co. v. Iota Indigo, LLC*,
    No. 2:13-cv-01837-MMD-PAL, 2015 WL 4647863 (D. Nev. Jan. 14, 2014)................14

*Craighead v. Full Citizenship of Maryland, Inc.*,
    No. CV PX 17-595, 2017 WL 3334852 (D. Md. Aug. 4, 2017) .......................................32

*Davis Wine Co. v. Vina Y Bodega Estampa, S.A.*,
    823 F. Supp. 2d 1159 (D. Or. 2011) ...........................................................10, 11

*Day v. Gracy*,
    No. CV 18-10396-FDS, 2018 WL 3518514 (D. Mass. July 20, 2018).............................20

*Demoulas v. Demoulas Super Markets, Inc.*,
    424 Mass. 501 (1997) ..............................................................................28

*Draghetti v. Chmielewski*,
    416 Mass. 808 (1994) ..............................................................................28

*EMC Corp. v. Pure Storage, Inc.*,
    No. CV 13-12789-JGD, 2016 WL 7826662 (D. Mass. Aug. 19, 2016)............................19

*European Motors, Ltd. v. Oden*,
    344 P.2d 195 (Nev. 1959).........................................................................13

*Evans v. PlusOne Sports, LLC*,
    686 F. App'x 198 (4th Cir. 2017) ..............................................................20

*Fish v. Tandy Corp.*,
    948 S.W. 2d 886 (Tex. App. 1997) ..............................................................10

*FT Travel - N.Y., LLC v. Your Travel Ctr., Inc.*,
    112 F. Supp. 3d 1063 (C.D. Cal. 2015)..........................................................12

iv

*Gardner v. Madsen*,
  949 P.2d 785 (Utah Ct. App. 1997) ................................................................ 11

*Global BTG LLC v. National Air Cargo, Inc.*,
  No. CV1101657MMMJCGX, 2013 WL 12121983
  (C.D. Cal. Jan. 7, 2013), *aff'd*, 650 F. App'x 303 (9th Cir. 2016) .................. 13

*Grand Pacific Finance Corp. v. Brauer*,
  783 N.E.2d 849 (Mass. App. Ct. 2003) ............................................................ 21

*Greaney v. McCormick*,
  273 Mass. 250 (1930) ....................................................................................... 16

*Harford Donuts, Inc. v. Dunkin' Donuts Inc.*,
  No. CIV. L-98-3668, 2001 WL 403473 (D. Md. Apr. 10, 2001) ..................... 20

*Henderson Apt. Venture v. Miller*,
  No. 2:09-cv-1849, 2012 WL 2780058 (D. Nev. Jul. 9, 2012) .................... 11, 12

*Hoeltke v. C.M. Kemp Manufacturing Co.*,
  80 F.2d 912 (4th Cir. 1935) .............................................................................. 14

*Hoppe v. Percheron Associates, LLC*,
  No. 11-CV-03233-CBS, 2012 WL 3135378 (D. Colo. Aug. 1, 2012) ........ 10, 11

*Jacobson v. Mailboxes Etc. U.S.A., Inc.*,
  646 N.E.2d 741 (Mass. 1995) ........................................................................... 18

*Jacobson v. Stern*,
  96 Nev. 56 (1980) ................................................................................... 9, 10, 16

*Jillian's Billiard Club of America, Inc. v. Beloff Billiards, Inc.*,
  619 N.E.2d 635 (Mass. App. Ct. 1993) ............................................................ 21

*Knight v. Manufacturers & Traders Trading Co.*,
  84 F. Supp. 3d 436 (D. Md. 2015) .................................................................... 25

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*,
  781 N.E.2d 787 (Mass. 2003) ..................................................................... 19, 20

*L'Oreal USA, Inc. v. RG Shakour, Inc.*,
  No. CIV.A. 08-40064-FDS, 2010 WL 3504140 (D. Mass. Sept. 3, 2010) ....... 18

*Laboratory Corporation of America v. Hood*,
  395 Md. 608 (2006) .......................................................................................... 22

*Las Vegas Machine & Engineering Works, Inc. v. Roemisch*,
  67 Nev. 1 (1950) ............................................................................................... 25

*Lorenz v. Beltio, Ltd.*,
    114 Nev. 795 (1998) ...........................................................................................9, 13

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
    412 F.3d 215 (1st Cir. 2005) ....................................................................................21

*Mead Corp. v. Stevens Cabinets, Inc.*,
    938 F. Supp. 87 (D. Mass. 1996) .............................................................................18

*Milliken & Co. v. Duro Textiles, LLC*,
    451 Mass. 547 (2008) .........................................................................................30, 32

*On Demand Direct Response, LLC v. McCart-Pollak*,
    No. 2:15-cv-01576-MMD-NJK, 2017 WL 3336277 (D. Nev. Aug. 4, 2017) .................15

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
    905 F.Supp.2d 675 (D. Md. 2012) ...........................................................................26

*PMC, Inc. v. Kadisha*,
    93 Cal. Rptr. 2d 663 (Cal. Ct. App. 2000) ...............................................................29

*Popponesset Beach Association, Inc. v. Marchillo*,
    658 N.E.2d 983 (Mass. Ct. App. 1996) ...............................................................14, 15

*Precon Corp. v. G & B Environmental, Inc.*,
    103 F.3d 119 (4th Cir. 1996) ...................................................................................26

*RaceRedi Motorsports, LLC v. Dart Machinery, Ltd.*,
    640 F. Supp. 2d 660 (D. Md. 2009) .........................................................................22

*Real Estate Central, Inc. v. Kramer*,
    255 A.2d 81 (Md. Ct. Spec. App. 1969) ..................................................................16

*Santagate v. Tower*,
    833 N.E.2d 171 (Mass. App. Ct. 2005) ...................................................................27

*Scully Signal Co. v. Joyal*,
    881 F. Supp. 727 (D.R.I. 1995) ...............................................................................20

*Seibold v. Camulos Partners LP*,
    No. Civ.A.5176, 2012 WL 4076182 (Del. Ch. Sept. 17, 2012) .......................................29

*Shain Investment Co. v. Cohen*,
    443 N.E.2d 126 (Mass. Ct. App. 1982) ...................................................................25

*Silver State Broadcasting, LLC v. Beasley FM Acquisition*,
    148 F. Supp. 3d 1132 (D. Nev. 2015) ................................................................10, 13

*Spering v. Sullivan*,
    361 F. Supp. 282 (D. Del. 1973) .................................................................16

*Sprint Nextel Corp. v. Simple Cell Inc.*,
    248 F. Supp. 3d 663 (D. Md. 2017)..........................................................26, 27

*Structural Preservation Systems, LLC v. Andrews*,
    No. CIV.A. MJG-12-1850, 2013 WL 3820023 (D. Md. July 23, 2013)..........................24

*Swedish Civil Aviation Administration v. Project Management Enterprises, Inc.*,
    190 F. Supp. 2d 785 (D. Md. 2002).........................................................23, 24

*Sweeney v. DeLuca*,
    No. 042338, 2006 WL 936688 (Mass. Super. Ct. Mar. 16, 2006) ...................................27

*T Street Development, L.L.C. v. Dereje*,
    Civ. Action No. 05-524 (GK), 2005 WL 3466651 (D.D.C. Dec. 19, 2005) ..............10, 11

*Telogis, Inc. v. InSight Mobile Data, Inc.*,
    No. PWG-14-563, 2014 WL 7336678 (D. Md. Dec. 19, 2014) .................................23, 24

*USACM Liquidating Trust v. Deloitte & Touche LLP*,
    764 F. Supp. 2d 1210 (D. Nev. 2011) ...............................................................29

*Village Builders 96, Ltd. Partnership v. U.S. Laboratories, Inc.*,
    121 Nev. 261 (2005)............................................................................31, 32

*Walrath v. Cushing*,
    150 A.2d 239 (1959)..............................................................................26

*White v. Dvorak*,
    896 P.2d 85 (Wash. Ct. App. 1995) .........................................................10, 11

*Yost v. Early*,
    87 Md. App. 364 (1991) ...........................................................................12

**STATUTES**

Massachusetts General Laws ch. 93A, § 11 ..............................................................17

**RULES**

Federal Rule of Civil Procedure 8 .......................................................................8

**TREATISES**

12 S. Williston, *Contracts* §35:71 (4th Ed. Lord 1999) .................................................9

18 American Jurisprudence 2d Corporations §136 (2011)............................................10

1A William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Private Corporations* (Perm. Ed. 2010) .......................................................................10, 12, 13, 29

2-7 Milgrim on Trade Secrets § 7.02[2][c] ...................................................................29

46 American Jurisprudence 2d Joint Ventures § 34 .....................................................25

Restatement (Third) of Agency (2006) .........................................................................11

Restatement (Third) of Unfair Competition (3rd 1995) ..........................................14, 26

**REGULATIONS**

21 C.F.R. § 312.23.........................................................................................................7

Plaintiffs Addison, Cassidy, Christine, and Hugh Hempel ("Plaintiffs" or the "Hempels") submit this Memorandum of Law in Opposition to the motion to dismiss for failure to state a claim by Defendants Cydan Development, Inc. ("Cydan")[1], Cydan II, Inc., Vtesse, Inc., Sucampo Pharmaceuticals, Inc. ("Sucampo"), and Mallinckrodt plc ("Mallinckrodt"). ECF No. 82 ("DM").

## PRELIMINARY STATEMENT

Defendants' motion should be denied. The Hempels took extraordinary risks pioneering the development of cyclodextrin to treat Niemann Pick Disease, Type C ("NPC")—an ultra-rare, degenerative, and fatal disease that afflicts the Hempel Twins. The Hempels took personal risks, invested millions of dollars and years of effort, and, in 2009 and 2010, successfully obtained unprecedented FDA recognition for cyclodextrin treatment. In 2013, as word of the Hempels' success spread, Cydan—a venture capital firm in Cambridge, Massachusetts—became interested in their work. Cydan reached out to the Hempels, invited them to discuss commercialization of the product, encouraged the Hempels to share confidential information, but then—after gaining access to their confidential information and trade secrets (the "Protected Material")—broke its promises of confidentiality and non-use, usurped the Hempels' commercial opportunity for itself, formed Vtesse in the image of the Hempels' proposal, and sold Vtesse for $200 million to Sucampo. Thereafter, with full knowledge of this dispute, Mallinckrodt acquired Sucampo.

On these facts, the Amended Complaint states claims for misappropriation against Cydan and Vtesse—which Defendants do not dispute—and, *inter alia*, breach of contract, unfair competition, breach of fiduciary duty, and tortious interference. Defendants move to dismiss Plaintiffs' non-trade secret claims with arguments that overlook and misapprehend controlling law:

*First*, the Hempels have enforceable contracts with Defendants. A corporate promoter has the power to enforce pre-incorporation contracts entered into on behalf of the proposed corporation, even if the proposed corporation never comes into existence. Here, the Hempels signed a

---

[1]     Unless otherwise stated, capitalized terms have the same definition as in the Amended Complaint.

Confidentiality Agreement on behalf of Solution Therapeutics, a wholly-owned company they built, but never incorporated. The Hempels conferred the benefits of that contract on Cydan by disclosing their Protected Material. And, after accepting the benefits of that contract and using the Hempels' Protected Material to realize more than $100 million in profit, Cydan now hopes to avoid its obligations by seizing on what is, at best, a technical defect. That cynical argument has no merit, and Defendants' argument rests entirely on a single, inapposite opinion. The Hempels have the power to enforce their contracts with Cydan and hold Defendants liable for their breach.

*Second*, the Hempels have alleged unfair competition and breaches of fiduciary duty. To gain access to the Hempels' Protected Material, Defendants promised not to use the information for any purpose, except to consider a business relationship with the Hempels. Instead, Cydan reviewed everything the Hempels had developed, collaborated with the Hempels over six months to build a joint enterprise, and assured the Hempels that they were going forward with their joint project. In secret, however, Cydan used the Hempels' Protected Material to form Vtesse and cut the Hempels out.

*Third*, Sucampo, Mallinckrodt, and Cydan II are liable for misappropriation and unjust enrichment. Cydan's misappropriators formed Vtesse and sat on Vtesse's board of directors. Their knowledge is imputed to Vtesse, which knowingly accepted the benefits the misappropriation. Moreover, Sucampo and Mallinckrodt received and used the Hempels' Protected Material, which they knew or should have known was misappropriated. The Hempels' Protected Material was unique, and related to an ultra-rare disease in a small medical research and development community. Anyone who came to possess that data, particularly after doing diligence on a treatment the Hempels had designed, would have known its source. Moreover, after acquiring VTS-270 from Vtesse, Sucampo retained the Vtesse executives who knew that Cydan and Vtesse had developed the asset by reference to the Hempels' Protected Material. Then, the Hempels filed this lawsuit before Mallinckrodt acquired VTS-270, meaning that Mallinckrodt completed the transaction with notice that it was acquiring misappropriated assets. Accordingly, because Defendants do not dispute that the Hempels have stated a claim of misappropriation against Cydan and Vtesse, Plaintiffs

have also stated claims of misappropriation against Sucampo and Mallinckrodt. And, for similar reasons, Plaintiffs have alleged successor liability against Sucampo, Mallinckrodt, and Cydan II.

For these reasons, and those stated herein, Defendants' motion should be denied in its entirety. If the Court grants any part of the motion, the Hempels request leave to amend the Complaint to cure any deficiencies identified by the Court and include any newly discovered facts, like those detailed at the close of this brief.

## BACKGROUND

**A.**

Addison and Cassidy Hempel are twins, born on January 23, 2004. *See* Am. Compl., ECF Doc. No. 76 ("AC"), ¶ 3. In 2007, the twins were diagnosed with NPC, an ultra-rare, degenerative neurological disease. *Id.* There are approximately 100 known cases in the United States. NPC causes severe disability, with symptoms akin to Alzheimer's disease, and premature death. *Id.*

In 2007, there was no approved treatment for NPC in the United States. AC ¶ 26. That year, a research paper was published showing that cyclodextrin could be used to treat NPC-like symptoms in mice. *Id.* ¶ 32. Upon learning of the publication, the Hempels both left their employment, and invested approximately $3 million of their personal time and money, along with millions of dollars in donations they raised and *pro bono* work they elicited from world-class physicians, to develop their own, privately-funded treatment for NPC using cyclodextrin. *Id.* ¶ 4. In 2009 and 2010, the United States Food and Drug Administration ("FDA") approved the Hempels' proposals for the clinical use of cyclodextrin in treating their daughters. It was the first time the FDA had permitted the use of cyclodextrin in humans. *Id.* ¶ 5.

Initially, the Hempels explored three different drug delivery pathways for treating NPC with cyclodextrin: intravenous injections (*i.e.,* bloodstream), intrathecal injections (*i.e.*, lower spinal cord), and intracerebral injections (*i.e.* directly into the brain). AC ¶¶ 41-43. Ultimately, the Hempels and their team of doctors, scientists, and advisors focused on intravenous and intrathecal cyclodextrin therapy, developing the first protocols for treating humans accordingly. *Id.* ¶ 43.

Between 2009 and 2013, the Hempels compiled a library of medical research and data evidencing that bi-monthly intrathecal injections of cyclodextrin was the most effective method known. *Id.* ¶ 46. The Hempels maintained the data in confidence, disclosing it only to the FDA and to physicians, researchers, and the parents of NPC children who received the information for compassionate use and under express and implied agreements that the data would not be used for commercial purpose. *Id.* ¶¶ 45, 92, & 105.

In 2011, the Hempels began developing a confidential business plan for an entity they referred to as Solution Therapeutics. AC ¶¶ 44 & 52; *see also* ECF No. 82-2 ("Business Plan"). The 43-page Business Plan detailed how the Hempels, doing business as Solution Therapeutics, intended to commercialize the cyclodextrin treatments they had developed, using the extensive and unique data set they had compiled to validate the viability of the investment. AC ¶ 44. The Hempels planned to obtain FDA marketing approval for cyclodextrin, which would grant them exclusive commercialization rights. *Id*. Moreover, because NPC is an ultra-rare pediatric disease, successful development of a therapeutic drug was expected to result in a "Priority Review Voucher" from the FDA, worth hundreds of millions of dollars. *Id.* The Business Plan said the Hempels would split the proceeds of any commercialization 50/50 with their investors. *Id.* ¶¶ 44 & 55. They intended to apply their share to fund a non-profit dedicated to benefiting NPC research and reducing patient costs. *Id*.; *see also* Business Plan 4.

**B.**

The Hempels and their efforts were well-known in the NPC community, and their successes were widely reported. AC ¶¶ 5, 29. In late June 2013, Chris Adams, the then-Chief Business Officer of Cydan—a venture capital-backed drug development incubator located in Cambridge, Massachusetts—contacted Hugh Hempel to discuss an investment in the Hempels' efforts. *Id.* ¶ 48. After several months of phone and email conversations, Adams invited Hugh to Massachusetts to meet in person with Cydan. *Id.* ¶¶ 50 & 58. In advance of the meeting, Hugh emailed Cydan a copy of the Business Plan, which he marked "Confidential." *Id.* ¶ 56; *see also* Business Plan 1. Christina Csimma, the then-CEO of Cydan, responded that "[t]he work you have done is truly

amazing." *Id.* ¶ 57.

Hugh met with Cydan on September 13, 2013, for two hours to discuss a potential collaboration with Cydan. *See* AC ¶ 58. He described his desire to build a company dedicated to intrathecal cyclodextrin treatment for NPC patients, with the goal of gaining marketing exclusivity and a Priority Review Voucher. *Id.* ¶ 59. Because Priority Review Vouchers were worth hundreds of millions of dollars, the Hempels hoped to sell it to a large pharmaceutical company, then reinvest their funds in their NPC-dedicated research and development company. *Id.*

The next day, Deb Geraghty of Cydan asked Hugh to send Cydan a confidentiality agreement and grant Cydan access to the Hempels' medical data and research. AC ¶ 60. In response to Cydan's request, Hugh sent a proposed "Agreement for Mutual Exchange of Confidential Information" between Solution Therapeutics and Cydan. *Id.* ¶¶ 61-67; *see also* ECF No. 82-3 (the "Confidentiality Agreement"). The Confidentiality Agreement prohibited Cydan from disclosing the Hempels' confidential information to any third-party or using it for any purpose other than consideration of a possible joint venture between the parties. AC ¶¶ 63-65; *see also* Confidentiality Agreement, Recitals. Csimma countersigned the Confidentiality Agreement on behalf of Cydan. AC ¶ 67; *see also* Confidentiality Agreement 3.

Pursuant to the Confidentiality Agreement, and at Cydan's request, the Hempels disclosed to Cydan virtually everything they had developed over the previous five years regarding cyclodextrin and NPC. AC ¶¶ 61 & 69-75. They gave Cydan access to their password-protected library of confidential medical research, treatment results, and their daughters' patient data, as well as their confidential FDA submissions. *Id.* ¶¶ 69-75. And, at Cydan's request, they used their goodwill to facilitate introductions between Cydan and NPC and NIH researchers. *Id.* ¶ 75.

For months thereafter, Hugh discussed and developed the intended joint venture with Cydan. AC ¶ 76. On January 16, 2014, Geraghty emailed the Hempels to say Cydan "[m]oving forward for sure" with their joint NPC venture. *Id.* ¶ 77. One month later, Adams and Hugh had a call to discuss the next steps. *Id.* ¶ 78. Because of Cydan's assurances, the Hempels ceased efforts to find a partner to commercialize an intrathecal cyclodextrin treatment for NPC. *Id.* ¶ 79.

Then, without explanation, Cydan broke off communications. AC ¶ 80. The Hempels assumed Cydan had decided to abandon the project or was otherwise occupied on others. *Id.* But they were wrong. Cydan continued developing the NPC project, soliciting investors, and building a team in secret. *Id.* ¶ 81. Ultimately, and without the Hempels' knowledge, in May 2014, Cydan formed Vtesse, a company dedicated to commercializing an intrathecal cyclodextrin treatment for NPC patients, known as VTS-270, with the goal of gaining marketing exclusivity and a Priority Review Voucher, the identical treatment and business strategy proposed by the Hempels. *Id.* ¶ 81. Cydan formed Vtesse in the image of the Hempels' Solution Therapeutics. *Id.* ¶ 83.

Prior to Vtesse's launch, only the Hempels had collected substantial data regarding intrathecal cylodextrin injections, and their Protected Material was the best evidence of the treatment's efficacy and commercial viability. AC ¶ 86. Moreover, their Business Plan provided a road map from development to commercialization. *Id.* ¶¶ 83-84. Their Protected Material and Business Plan was the foundation of the Vtesse enterprise. Indeed, Vtesse's scientific review board consisted of the same NPC and NIH researchers identified in the Hempel's Business Plan, and to whom the Hempels had introduced Cydan. *Id* ¶¶ 61, 75, 90, & 103. And Csimma and Adams from Cydan sat on Vtesse's board of directors. *Id.* ¶ 86.

## C.

After its formation, Vtesse continued to misappropriate and use the Hempels' trade secrets, including from NIH-funded researchers. In the years prior to Vtesse's formation, the Hempels had selectively disclosed their Protected Material for compassionate use to certain researchers who wanted to treat specific NPC patients. AC ¶ 45. The Hempels disclosed their Protected Material with the express and implied understanding that their it would only be used for ***medical, not commercial,*** purposes. *Id.* ¶¶ 42 & 92. But Vtesse sought out those researches who had access to the Hempels' Protected Material, placed those researchers its board of scientific advisors, and funded their research, so Vtesse could use their results for commercial gain. *Id.* ¶¶ 88-107.

Vtesse misappropriated the Hempels' data through the NIH-affiliated researchers it captured. In December 2012, NIH researchers began a phase 1 trial of intracranial injections of

cyclodextrin in NPC patients. *See* AC ¶ 91. The NIH requested a right of reference ("ROR")[2] to the Hempels' confidential information to support its study. *Id.* ¶ 92. The NIH assured the Hempels in writing that its study would not compete with the Hempels' intrathecal and intravenous cyclodextrin research and development efforts. *Id.* Upon those promises, the Hempels granted the NIH the ROR. After three participants in the NIH's trial suffered brain infections, the FDA shut down the NIH study in spring of 2013. *Id.* ¶ 93.

When the NIH failed, it sought to reconfigure its cyclodextrin studies. AC ¶ 95. In May 2013, the NIH-funded researchers discussed how to pivot from intracranial to intrathecal treatment. *Id.* They acknowledged that the only way to avoid spending years developing a data set sufficient to convince the FDA that intrathecal cyclodextrin treatments were safe would be to reference the Hempels' data. *Id.* ¶¶ 95-99. Rather than ask the Hempels for permission, however, they said they would secure access through "back channels" at the FDA. *Id.* ¶ 96.

That is precisely what the NIH researchers did. *Id.* Just three months after saying their options were either (a) spend years compiling safety data, or (b) misappropriate the Hempels' trade secrets, NIH-funded researchers began intrathecal cyclodextrin study using dosages supported by the Hempels' data. AC ¶¶ 100. Thereafter, Vtesse took over the NIH's intrathecal cylodextrin trial. *See id.* ¶¶ 103. And Vtesse placed the NIH-funded researchers who were conducting the trial, *i.e.*, the NIH-funded researchers who had misappropriated the Hempels' Protected Material, on its scientific review board. *Id.* ¶¶ 90 & 103.

Separately, in September 2013, the Hempels granted Dr. Elizabeth Berry-Kravis an ROR in support of her application to the FDA to treat two patients intrathecally with cyclodextrin. *Id.* ¶ 105. After gaining authorization from the Hempels to reference their data for a limited, non-commercial purpose, Berry-Kravis modified her study at Vtesse's request, so that Vtesse could use her results to support its competitive commercial efforts. *Id.* ¶¶ 106. Vtesse rewarded Berry-Kravis's misappropriation by placing her on its scientific board of review. *Id.* ¶ 103.

---

[2]    A right of reference is an instruction to the FDA to consider one party's proprietary data when considering another party's proposed protocol. *See*, *e.g.*, 21 C.F.R. § 312.23(b).

**D.**

In January 2016, Vtesse announced it had secured key approvals for its intrathecal cy-clodextrin treatment for NPC, *i.e.*, Breakthrough Therapy and Rare Pediatric Disease designations. AC ¶ 108. In April 2017, Sucampo announced it had purchased Vtesse for $170 million in cash and 2.8 million Sucampo shares. *Id.* ¶ 110. Sucampo's valuation of Vtesse was based upon the expected FDA grant of commercial exclusivity to VTS-270 (a cyclodextrin molecule equivalent to the molecule used by the Hempels in their studies) to treat NPC, and the expected Priority Re-view Voucher that would follow. *Id.* ¶ 112. On December 26, 2017, Mallinckrodt announced that it was acquiring Sucampo and VTS-270. *Id.* ¶ 121. Vtesse was barely mentioned—only as the prior owner of VTS-270—because it had been fully enveloped into Sucampo's enterprise. *Id.* ¶ 124. Mallinckrodt closed its acquisition of VTS-270 on February 13, 2018, more than a month after this case was first filed. *Id.* ¶ 121.

## ARGUMENT

"Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts "as true all well-pleaded allegations in the plaintiff's complaint and draw[s] all reasonable factual inferences in the plaintiff's favor." *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 705 (4th Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## I.    THE HEMPELS HAVE STATED A CLAIM FOR BREACH OF CONTRACT.

Defendants' motion to dismiss the Hempels' contract claim misapprehends corporate pro-moter law, ignores the implied contract between Cydan and the Hempels, and overlooks the alle-gations that Cydan executives both used the Hempels' Protected Material and improperly disclosed it to Vtesse, which knowingly accepted the benefit of those contracts and breaches.

### A.      The Hempels Have Alleged Enforceable Contracts with Cydan.

The Complaint alleges at least two agreements between the Hempels and Cydan: (i) the written Confidentiality Agreement and (ii) an implied contract related to the Business Plan.

### 1.      The Confidentiality Agreement is Enforceable.

Defendants move to dismiss Plaintiffs' breach of contract claim by relying upon a single, inapposite Nevada district court opinion that misstates Nevada law. DM 5-7. Their argument is a cynical attempt to capitalize on what is, at best, a technical defect in a contract from which they received substantial benefits. This Court should not countenance Defendants' gamesmanship.

A promoter contract is one entered into on behalf of a corporation before it comes into existence. As Professor Williston explained, "Often the terms of [promoter] contracts are such that if the corporation were already in existence, the contract would be that of the corporation and not of the promoter. But as it is impossible for the corporation to contract before it comes into existence, the contract is treated as that of the promoter even though the language of the contract is appropriate for a contract by the corporation." 12 S. Williston, *Contracts* §35:71, pp. 534-35 (4th ed. Lord 1999). Defendants assert—without authority—that the principles of promoter contracts only apply when "an individual in the process of creating a company signs a contract *in his personal capacity with an understanding among the parties that the contract will be later adopted by the company once it exists*." DM 5 (emphasis supplied). Defendants' restrictive definition of what constitutes a promoter contract has no basis in fact or law.[3] *See, e.g.*, *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 351 (Del. Ch. 2003) (noting that "promoter" is a broad and flexible term, with no precise definition). Indeed, as discussed *infra* at 13, the Nevada Supreme Court has long recognized that promoter contracts can be entered into in the name of the non-existent corporation. *See, e.g.*, *Lorenz v. Beltio, Ltd.*, 114 Nev. 795, 805 & n.7 (1998); *see also*

---

[3]      Defendants falsely imply this limited meaning of promoter contracts comes from *Jacobson v. Stern*, 605 P.2d 198, 201 (Nev. 1980). DM 5. At no point did the Nevada Supreme Court suggest that the principles underlying corporate promoter law only applies to contracts entered into in the promoter's name. *See Jacobson*, 605 P.2d at 201-02.

*Silver State Broad., LLC v. Beasley FM Acquisition*, 148 F. Supp. 3d 1132, 1140-41 (D. Nev. 2015).

The principles of promoter contracts are founded on the understanding that "[u]nderlying every contract is the presumption that the parties intend to create an enforceable obligation." *White v. Dvorak*, 896 P.2d 85, 90 (Wash. Ct. App. 1995). Because enforceability requires mutuality, promoters are liable on the pre-incorporation contracts they enter on the corporation's behalf. *Jacobson*, 605 P.2d at 201; *see also Clinton Inv'rs Co., II v. Watkins*, 146 A.D.2d 861, 862-63 (N.Y. App. Div. 1989) ("Generally, a promoter who executes a preincorporation contract in the name of a proposed corporation is himself personally liable on the contract unless the parties have otherwise agreed.").

The corollary—applicable to this case—is equally well-established: because promoters are liable on pre-incorporation contracts, they also "retain the power to enforce pre-incorporation contracts—*even if the proposed corporation never even comes into being*." *T St. Dev., L.L.C. v. Dereje & Dereje*, Civ. Action No. 05-524 (GK), 2005 WL 3466651, at *5 (D.D.C. Dec. 19, 2005) (emphasis added); *see also Hoppe v. Percheron Assocs., LLC*, No. 11-CV-03233-CBS, 2012 WL 3135378, at *4 (D. Colo. Aug. 1, 2012) (citing cases); *Davis Wine Co. v. Vina Y Bodega Estampa, S.A.*, 823 F. Supp. 2d 1159, 1176 (D. Or. 2011) (citing cases); 18 Am. Jur. 2d, *Corporations* §136 (2011) ("Generally, a promoter is entitled to the benefit of the contract he made on behalf of the corporation and is a proper party plaintiff to enforce those rights."). In other words, "[b]ecause any enforceable agreement is mutual and binding on both parties, logic dictates [that] a promoter who is liable under an agreement may also make a claim under such a contract." *Fish v. Tandy Corp.*, 948 S.W. 2d 886, 898 (Tex. App. 1997); 1A William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Private Corporations* § 271 (perm. ed. 2010) ("The mutuality, which is essential in all contracts, not only makes promoters' contracts binding on the promoters, but it also allows them to enforce the contracts insofar as they have rights under it."); Restatement (Third) of Agency § 6.04 (2006) ("[A] person who makes a contract with a third party purportedly as an agent on behalf of a principal *becomes a party* to the contract if the purported agent knows or has reason to

10

know that the purported principal does not exist or lacks capacity." (emphasis added)).

Unwilling to follow logic or law, Defendants insist that "[a]n undisclosed promoter cannot enforce a contract he executed on behalf of a nonexistent corporation." DM 6. Unsurprisingly, Defendants do not cite any supporting case law for that proposition,[4] because it has been roundly rejected. As the Washington Court of Appeals wrote in its seminal opinion, *White v. Dvorak*, "*[A]bsent unfair prejudice*, an individual purporting to act as a corporation is a party to a contract signed *in the name of a nonexistent corporation.* As a party, the individual can sue for breach of contract." 896 P.2d at 87 (emphasis supplied) (holding promoter could enforce contract entered into in the name of nonexistent corporation); *see also Hoppe*, 2012 WL 3135378, at *4 (same); *Davis Wine Co.*, 823 F. Supp. 2d 1174-76 (same); *T St. Dev.*, 2005 WL 3466651, at *5 (same); *Gardner v. Madsen*, 949 P.2d 785, 789 (Utah Ct. App. 1997) ("The individual who signs a contract in the name of a nonexistent corporation can be a party to the contract.").

Accordingly, absent any unfair prejudice, Hugh Hempel can enforce the pre-incorporation Confidentiality Agreement he entered into on behalf of the unincorporated Solution Therapeutics, which, because of Cydan's misconduct, never came into being. Defendants do not, because they cannot, reference any unfair prejudice they suffered as a result of the Confidentiality Agreement being executed on behalf of the unincorporated Solution Therapeutics. Cydan met with Hugh Hempel for the express purpose of discussing a joint venture, knowing he was seeking funding for Solution Therapeutics. Cydan requested the Confidentiality Agreement so they could gain access to the Hempels' Protected Material. And, in connection with the Confidentiality Agreement, Cydan did gain access to the Hempels' Protected Material.

Because they suffered no prejudice, Defendants' argument boils down to the type of

---

[4]   Defendants rely entirely on *Henderson Apt. Venture v. Miller*, No. 2:09-cv-1849, 2012 WL 2780058 (D. Nev. Jul. 9, 2012), an opinion that is both inapposite, because it does not discuss a promoter's rights at all, and contrary to Nevada law, for reasons discussed *infra* at 12-13.

commercially cynical conduct that courts routinely reject. As the Nevada Supreme Court reasoned, "A person shall not be allowed at once to benefit by and repudiate an instrument, but, if he chooses to take the benefit which it confers, he shall likewise take the obligations or bear the onus which it imposes." *Alexander v. Winters*, 24 Nev. 143, 146 (1897); *see also Chartrand v. Barney's Club, Inc.*, 380 F.2d 97 (9th Cir. 1967) (same); *Yost v. Early*, 87 Md. App. 364, 382 (1991) (if corporation formed after creation of a contract "ratifies the contract or accepts its benefits with full knowledge of the circumstances of their acquisition, . . . the corporation is bound by the contract's obligations") (internal quotation marks omitted). Indeed, courts reject opportunistic efforts to "capitalize on [a] technical naming error in contravention of the parties' evident intentions." *FT Travel - N.Y., LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1086 (C.D. Cal. 2015); *see Bommer v. Am. Spiral Spring Butt Hinge Mfg. Co.*, 81 N.Y. 468, 469 (1880) (finding it "immaterial" that an agreement had been made in the name of a corporation prior to its organization and holding that the agreement was enforceable by the corporation because the corporation subsequently ratified it). Because Cydan realized the benefits of the Confidentiality Agreement, Cydan cannot repudiate its terms. *Chartrand*, 380 F.2d at 102; *see also* 1A *Fletcher Cyc. Corp.* § 207.

Defendants' argument rests entirely on the inapposite *Henderson Apartment Venture v. Miller*. In *Henderson*, a limited liability company attempted to enforce contracts entered into in its name before it came into existence. 2012 WL 27880058 at *3. On summary judgment, the court asserted—without citing any authority—that a corporation could not ratify pre-incorporation contracts executed in its name. *Id.* at *8.

As an initial matter, the present case does not involve ratification, so *Henderson*'s reasoning is irrelevant. Ratification would apply if Hugh Hempel had incorporated Solution Therapeutics after executing the Confidentiality Agreement in its name, and if Solution Therapeutics were now trying to enforce the Confidentiality Agreement against Cydan. This case poses the opposite scenario: the Hempels are enforcing a contract they signed in Solution Therapeutics' name. Because *Henderson* does not discuss promoter rights, its assertion regarding ratification is of no moment.

Even if it were relevant, *Henderson*'s reasoning is contrary to well-established Nevada law.

12

Nevada has long permitted a corporation to ratify pre-incorporation contracts entered into in its name. *See, e.g.*, 1A *Fletcher Cyc. Corp.* § 207 n.3 (noting that Nevada follows the majority rule). For example, in *Lorenz v. Beltio, Ltd.*, a promoter executed a pre-incorporation agreement assigning a lease to a non-existent corporation. 114 Nev. 795. The defendant argued the assignment was void because the corporation had not been formed when the assignment was executed. *Id.* at 805. The court rejected that argument because the corporation had ratified the contract after its incorporation. *Id.* at n.7. Following *Lorenz*, the Nevada District Court held in *Silver State Broadcasting* that a corporation could ratify pre-incorporation contracts signed in its name by the promoter. 148 F. Supp. 3d at 1140-41.[5]

Similarly, in *European Motors, Ltd. v. Oden*, the Nevada Supreme Court held that a corporation had impliedly ratified an oral pre-incorporation employment contract between husband and wife, who were building a business together. 344 P.2d 195, 197 (Nev. 1959). The pre-incorporation contract was between the husband and the to-be-incorporated-corporation, and not between husband and wife. The Nevada Supreme Court upheld the ratification. *Id.*

These binding precedents establish that a corporation can ratify pre-incorporation contracts entered into its name. Thus, to the extent *Henderson* held that pre-incorporation contracts signed in the name of a corporation are dead letters, *Henderson* is simply wrong. Indeed, the only opinion to consider *Henderson* in any depth rejected its reasoning and noted that it was at odds with the common law. *See Glob. BTG LLC v. Nat'l Air Cargo, Inc.*, No. CV1101657MMMJCGX, 2013 WL 12121983, at *11 (C.D. Cal. Jan. 7, 2013), *aff'd*, 650 F. App'x 303 (9th Cir. 2016) (rejecting *Henderson*).

For these reason, the Confidentiality Agreement is fully enforceable by the Hempels.

## 2.   An Implied Contract Governed the Business Plan.

The Hempels also had an implied contract with Cydan regarding their Business Plan.

---

[5]   *Silver State* cited *Henderson*, but did not follow its reasoning. *See Silver State*, 148 F. Supp. 3d at 1140.

An implied-in-fact contract exists where "the parties intended to contract and promises were exchanged, the general obligations for which [were] sufficiently clear." *Commonwealth Land Title Ins. Co. v. Iota Indigo, LLC*, No. 2:13-CV-01837-RFB, 2015 WL 4647863, at *4 (D. Nev. Aug. 5, 2015) (quotation marks omitted). "An implied-in-fact contract comes into being when, notwithstanding the absence of a written agreement or verbal agreement expressing mutual obligations, the conduct or relations of the parties imply the existence of a contract." *Popponesset Beach Ass'n, Inc. v. Marchillo*, 658 N.E.2d 983, 987 (Mass. Ct. App. 1996); *see Commonwealth Land*, 2015 WL 4647863, at *4 (same). Moreover, "an express agreement regarding the confidentiality of particular information may be evidence of the parties' expectations regarding the confidentiality of other information not within the scope of the agreement." Restatement (Third) of Unfair Competition § 41 cmt. b (1995) ("Restatement of Unfair Competition").

A business plan or idea may be protected by an implied contract of confidentiality when the plan is novel and concrete. *Bergman v. Electrolux Corp.*, 558 F. Supp. 1351, 1353 (D. Nev. 1983). "Novelty pertains to originality or innovation; concreteness means that the idea has been sufficiently developed so as to be ready for immediate use without additional embellishment." *Id.* Whether the plan is novel and concrete is a question of fact. *Id*.

Cydan and the Hempels entered into an implied contract to maintain the confidentiality of the Business Plan. On behalf of Cydan, Adams initiated contact with the Hempels to discuss collaboration, and solicited a meeting. *Id.* ¶¶ 48-58. In advance of that meeting, Hugh sent the Business Plan, which he prominently marked "Confidential." *Id.* ¶ 56; *see also* Business Plan. Thereafter, the parties executed a Confidentiality Agreement that expressly included "business plans." Confidentiality Agreement § 1(a). Under the circumstances, Cydan both explicitly and implicitly agreed it would not use the Business Plan without the Hempels' consent. *See Hoeltke v. C.M. Kemp Mfg. Co.*, 80 F.2d 912, 923 (4th Cir. 1935) (holding obligation of confidentiality implied in negotiations over possible patent license for invention still in pre-marketing development stage).

The Complaint also alleges that the Business Plan was novel and concrete. AC ¶¶ 52-55. It was novel because it set forth a path for the commercialization of cyclodextrin—a new treatment

14

for NPC that had never been commercialized before—and it was buttressed by the Hempels' unique body of medical research regarding intrathecal cyclodextrin treatments. *See* Business Plan. In fact, Cydan responded to the Business Plan by saying that the Hempels' work was "truly amazing." *Id.* ¶ 57.

And it was concrete. Oral presentations, demonstrations, and written proposals of ideas that are sufficiently developed to be "usable" satisfy the concreteness requirement. *Bergman*, 558 F. Supp. 1351; *cf. On Demand Direct Response, LLC v. McCart-Pollak*, No. 2:15-cv-01576-MMD-NJK, 2017 WL 3336277, at *2 (D. Nev. Aug. 4, 2017) (holding idea and brochure sufficient to create property interest for quasi-contract). Here, the Business Plan was a 43-page presentation detailing the business goals and the scientific and medical research data establishing the viability of the enterprise, along with the relevant collaborators and ongoing research to illustrate the flexibility of the enterprise. AC ¶¶ 52-54; *see also* Business Plan. And Cydan executed that plan in Vtesse. Accordingly, Plaintiffs have alleged an implied contract.

For their part, Defendants cite *Popponesset Beach* to argue that they could not be compelled to pay for the benefits conferred by the Hempels because the benefits were "unsolicited by Cydan without advanced warning or an opportunity to decline it." DM 8. That is absurd. In *Popponesset*, a beach association provided general public services, like maintenance of roads, and demanded the defendants pay for services the defendants had not requested after the services had been provided. 658 N.E.2d at 985. The court refused to imply a contract because defendants had never solicited, or availed themselves of, the association's services. *Id.* at 987.

Here, by contrast, Cydan was searching for investment opportunities, contacted the Hempels because of the work they had done regarding NPC and cyclodextrin, and invited Hugh Hempel to a meeting regarding a proposed joint business venture. AC ¶¶ 9, & 48-50. In connection with that meeting, Hugh sent his Business Plan to Cydan, which he prominently marked "Confidential." *Id.* ¶ 56; *see also* Business Plan. Thus, Cydan solicited the proposal and advanced warning that it was confidential. After realizing the Hempels regarded their Business Plan as confidential, Cydan (a) reviewed the Plan, (b) concluded it was "truly amazing," (c) held a meeting with

15

Hugh, (d) encouraged him to share the rest of the Hempels' Protected Material, (e) exploited the Hempels' goodwill by asking them to make critical industry introductions, and (f) spent months working with the Hempels and assuring them Cydan intended to move forward jointly with the project. AC ¶¶ 57-78. On these facts, Plaintiffs have sufficiently alleged facts demonstrating an implied contract to protect the confidentiality of the Hempels' Business Plan. *See Anisgard v. Bray*, 419 N.E.2d 315, 318 (Mass. App. Ct. 1981) (use of plaintiff's idea and services by defendants created obligation to pay plaintiff); *Greaney v. McCormick*, 273 Mass. 250, 253 (1930) ("Although the agreement at its inception is unilateral, upon acceptance it becomes binding upon both parties.").

Finally, Defendants obtusely argue that it is unclear what the parties agreed to. DM 9. The implied agreement—consistent with the express terms of the Confidentiality Agreement that the parties signed contemporaneously—was that Cydan would not use the Hempels' Business Plan except in the pursuit of a joint venture with them. Cydan assented to these terms by soliciting the Business Plan, reviewing it, and assuring the Hempels that Cydan intended to move forward with them. Cydan breached that implied contract by cutting the Hempels out of the venture.

### B. Vtesse Is Bound by Cydan's Contracts with the Hempels.

A corporation may, when organized, expressly or impliedly adopt or ratify contracts entered into by its promoters prior to its existence. *Jacobson*, 96 Nev. at 60-61 (cited at DM 4); *see also Chartrand*, 380 F.2d at 100-02. Ratification occurs when the corporation knowingly accepts the benefits of the contract. *Jacobson*, 96 Nev. at 60-61; *see also Chartrand*, 380 F.2d at 100-02. A promoter's knowledge is imputed to the corporation when the promoter becomes a director of the corporation. *See Chartrand*, 380 F.2d at 100-01; *see also Spering v. Sullivan*, 361 F. Supp. 282, 286 (D. Del. 1973) (same under Delaware law); *Real Estate Central, Inc. v. Kramer*, 255 A.2d 81, 83 (Md. Ct. Spec. App. 1969) (same under Maryland law).

Here, Cydan was Vtesse's promoter. Cydan executives who had knowledge of the Hempels' Confidential Information and Business Plan were the same people who organized Vtesse. AC ¶¶ 48, 59, 67, & 84. After Vtesse's formation, those same Cydan executives sat on

Vtesse's board of directors. *Id.* ¶ 84. Vtesse thus knowingly accepted the benefits of Cydan's contracts with the Hempels, *i.e.*, access to the Hempels' confidential information and knowledge of the commercial viability of their proposal, and exploited that knowledge and information when executing the Hempels' Business Plan. Vtesse ratified Cydan's contractual obligations to the Hempels and is liable for the breach.

### C.    The Confidentiality Agreement Does Not Require Dismissal of Plaintiffs' Non-Contract Claims.

The Confidentiality Agreement states that it "supersedes any applicable state laws with respect to trade secrets and confidentiality." Ex. B at 4. Defendants contend that this clause mandates dismissal of Plaintiffs' non-contract claims against Cydan. DM 9-10. That is not so.

The Confidentiality Agreement governs the disclosure of the Hempel's Confidential Information to Cydan. It does not supersede any breach of fiduciary duty, unfair competition, tortious interference or related claims premised on Cydan's unfair usurpation of the Hempels' business opportunity. Those claims do not come within the ambit of "trade secrets" or "confidentiality." *See also infra* at 24. Accordingly, the Confidentiality Agreement—the enforceability of which Defendants dispute—does not require dismissal of Plaintiffs' non-contract claims against Cydan, certainly not at this juncture.

## II.    THE HEMPELS HAVE STATED A CLAIM FOR VIOLATION OF CHAPTER 93A, § 11.

Defendants move on three separate grounds for dismissal of Plaintiffs' claim under Massachusetts Consumer Protection Law, Mass. Gen. Laws ch. 93A, § 11 ("Chapter 93A"). Each should be rejected.

### A.    The Confidentiality Agreement Does Not Preclude Application of Chapter 93A, § 11.

Defendants contend that Chapter 93A does not apply because the Confidentiality Agreement has a Nevada choice of law provision. That argument fails.

The choice of law provision in the contract does not require application of Nevada law to all claims between the Hempels and Cydan. It merely states, "This Agreement is to be construed

and interpreted under and in accordance with the substantive laws of the State of Nevada, USA." Ex. B at 3. That is to say, it merely requires the application of Nevada law to determine what the contract means; it does not require the application of Nevada law to determine Cydan's liability under other causes of action.

"[A] clause providing that the contract is to be 'governed' or 'construed' by a particular state's law does not dictate the choice of law applicable to non-contract (*e.g.*, tort or statutory) claims between the contracting parties." *Catlin Specialty Ins. Co. v. Am. Superconductor Corp.*, No. CIV.A. 12-2314-BLS1, 2014 WL 840693, at *9 (Mass. Super. Ct. Jan. 29, 2014). Accordingly, Massachusetts courts have held that choice of law provisions virtually identical to the choice of law provision in the Confidentiality Agreement do not preclude Chapter 93A claims. In *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, the Massachusetts Supreme Judicial Court rejected the argument that a choice of law clause barred a chapter 93A claim simply because it said the contract was "to be construed under and governed by the laws of the State of California." 646 N.E.2d 741, 743 (Mass. 1995). "The agreement does not state that the rights of the parties are to be governed by California law but only that the agreement is to be governed and construed by California law." *Id.* at 746 n.9. Accordingly, "[t]he choice of law clause does not purport to bar the application of G.L. c. 93A to the parties' dealings in Massachusetts." *Id.*

Similarly, in *L'Oreal USA, Inc. v. RG Shakour, Inc.*, the choice of law provision, which read, "[t]his Agreement shall be construed in accordance with and all disputes herein shall be governed by the internal laws of the State of New York," did not require the exclusive application of New York law to all of defendant's conduct. No. CIV.A. 08-40064-FDS, 2010 WL 3504140, at *5 (D. Mass. Sept. 3, 2010). Because the choice of law provision in the Confidentiality Agreement is virtually identical to the choice of law provision in *Jacobson* and *L'Oreal*, it does not bar Chapter 93A claims for the same reasons.

Defendants do not cite any cases to the contrary. For example, they cite *Mead Corp. v. Stevens Cabinets, Inc.*, 938 F. Supp. 87 (D. Mass. 1996), which is readily distinguishable. There, the choice of law clause read, "This document *and the sale of any products hereunder* shall be

18

governed by and construed in accordance with the laws of the State of Ohio." *Id*. at 88 (emphasis added). Thus, that clause is far broader than the one contained in the Confidentiality Agreement, and was intended to govern not only the interpretation of the contract, but also conduct related to the performance of the contract.

Finally, for the avoidance of doubt, the mere existence of the Confidentiality Agreement does not render the Chapter 93A claim duplicative. "[A] claim for misappropriation of trade secrets, in violation of a non-disclosure agreement and in an attempt to do business with a third party, can support a claim under Chapter 93A." *Aware, Inc. v. Centillium Commc'ns, Inc.*, 604 F. Supp. 2d 306, 312 (D. Mass. 2009).

In sum, the Confidentiality Agreement does not affect Plaintiffs' Chapter 93A claim.

**B.    Cydan's Misconduct Occurred**
**"Primarily and Substantially" in Massachusetts.**

Cydan's alleged wrongdoing did occur "primarily and substantially" within Massachusetts. Disputing that conclusion, Defendants misstate the law and mischaracterize the allegations.

Though it is true that courts look at the "center of gravity" to determine the site of the wrongdoing, Massachusetts long ago rejected the three-factor test cited by Defendants. *Compare* DM 11 (citing three-factor test) *with EMC Corp. v. Pure Storage, Inc.*, No. CV 13-12789-JGD, 2016 WL 7826662, at *3 (D. Mass. Aug. 19, 2016) ("the three-part test is no longer controlling"). As the Supreme Judicial Court of Massachusetts explained in *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, the "analysis required under § 11 should not be based on a test identified by any particular factor or factors . . . . Section 11 suggests an approach in which a judge should, *after making findings of fact*, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." 781 N.E.2d 787, 799 (Mass. 2003).

Under the center of gravity test, "the alleged wrongdoer's conduct becomes the focus of the inquiry." *EMC*, 2016 WL 7826662, at *3. That is particularly true where, as here, the misconduct is the misappropriation of confidential information that causes unjust enrichment. In such a

case, the plaintiff's location and where the losses accrued are largely irrelevant. *See Scully Signal Co. v. Joyal*, 881 F. Supp. 727, 743-44 (D.R.I. 1995); *cf. Evans v. PlusOne Sports, LLC*, 686 F. App'x 198, 207–08 (4th Cir. 2017) (holding Chapter 93A did not apply because "center of gravity" was in Virginia, where misconduct occurred, rather than Massachusetts, where the plaintiff was deceived and felt injury). Indeed, the only case cited by Defendants in support of their conclusion that the plaintiff's location is most significant is a pre-*Kuwaiti* opinion that also noted all misconduct took place outside Massachusetts. *Harford Donuts, Inc. v. Dunkin' Donuts Inc.*, No. CIV. L-98-3668, 2001 WL 403473, at *6 & n.15 (D. Md. Apr. 10, 2001).

To be clear, Cydan's misconduct occurred primarily in Massachusetts. Cydan was headquartered there. AC ¶ 17. Cydan contacted Hugh Hempel from Massachusetts by LinkedIn, email, and phone. *Id.* ¶ 48. Cydan invited Hugh Hempel to Massachusetts, where they met to discuss his business plan. *Id.* ¶¶ 50 & 58. After the meeting, Cydan contacted Hugh Hempel and requested access to the Hempels' Protected Material. *Id.* ¶ 61. And it was in Cambridge, Massachusetts, where Cydan reviewed the Hempels' Confidential Information and Business Plan and developed the scheme to form Vtesse. *Id.* ¶¶ 69-81. *That* misconduct—the unauthorized use of the Hempels' Confidential Information and Business Plan—occurred in Massachusetts. Defendants are simply wrong when they allege—contrary to the allegations in the complaint—that "[t]he alleged wrongdoing—*i.e.*, Cydan's alleged transfer to Vtesse of the Hempels' information—necessarily occurred, if at all, in Maryland, where Vtesse resides." DM 10. At most, Defendants' assertion raises issues of fact that cannot be resolved on a motion to dismiss. *See, e.g.*, *Kuwaiti*, 781 N.E.2d at 799 (requiring findings of fact to determine "primarily and substantially" analysis).

## C.    The Hempels and Cydan were Engaged in the Conduct of Commerce.

Finally, Defendants contend that Chapter 93A does not apply because the Hempels were not engaged in any trade or commerce. DM 11. That argument has no merit.

Chapter 93A applies to persons "acting in a 'business context.'" *Day v. Gracy*, No. CV 18-10396-FDS, 2018 WL 3518514, at *3 (D. Mass. July 20, 2018). Courts have routinely held that Chapter 93A applies to persons sharing information pursuant to a commercial collaboration. *See*

20

*Aware*, 604 F. Supp. 2d at 312; *see also Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215, 229, 238, 242-43 (1st Cir. 2005) (holding jury could find that defendant violated chapter 93A by disclosing plaintiff's confidential information to a third party—which the plaintiff alleged constituted trade secret misappropriation and breach of a nondisclosure agreement—in an attempt to do business with the third party); *Jillian's Billiard Club of America, Inc. v. Beloff Billiards, Inc.,* 619 N.E.2d 635, 639 (Mass. App. Ct. 1993) (affirming judgment holding that defendant violated chapter 93A by using trade secret consisting of plaintiff's financial information to establish competing billiard parlor). The Hempels shared their information with Cydan in the hope of establishing a joint venture for the commercialization of cyclodextrin to treat NPC and other diseases. Both parties were undoubtedly acting in a "business context."

Defendants cite *Cavicchi v. Koski*, for the proposition that Chapter 93A "does not apply to *internal disputes* between parties who *are associated* in the interests of forming a business venture together." 855 N.E. 2d 1137, 1145 (Mass. App. Ct. 2006) (emphasis added). But *Cavicchi*, and the case law upon which it is founded, is readily distinguishable because it entailed an "intra-enterprise dispute." *Id.* This case, by contrast, involves "interactive business transactions" "with independent business entities." *Grand Pac. Fin. Corp. v. Brauer*, 783 N.E.2d 849, 860 n.7 (Mass. App. Ct. 2003). The Hempels independently developed their Protected Material and Business Plan, and shopped their work to a number of investors, including Cydan, in hopes of securing financing and embarking on a joint venture. AC ¶¶ 44-47. But Cydan formed Vtesse—the intended joint venture—in secret. *Id.* ¶ 82. The Hempels have never been shareholders in Vtesse. That is—by Cydan's account—Cydan never formed an association with Hempels, such that this dispute could not have been "internal."

Ultimately, if the Court finds that the Hempels and Cydan always acted at arms-length and their relationship occurred exclusively in the "business context," then Chapter 93A applies. If the Court finds that the Hempels and Cydan formed a joint venture that Cydan improperly usurped for itself, then this dispute is fundamentally "internal" and Cydan breached its fiduciary duties to the Hempels. But those conclusions involve questions of fact that cannot be resolved at this stage.

## III.    THE HEMPELS HAVE STATED COMMON LAW AND EQUITABLE CLAIMS.

Defendants argue that the Maryland Uniform Trade Secret Act ("MUTSA") preempts the Hempels' common law tort and restitution claims. DM 12-14. That argument is not only irrelevant to Plaintiffs' claims against Cydan, but also premature.

### A.    MUTSA Does Not Govern Plaintiffs' Claims Against Cydan.

Defendants assume that MUTSA governs all of Plaintiffs' claims. DM 12-14. That is not true. Massachusetts law governs the Hempels' claims against Cydan. And because Massachusetts had not adopted the Uniform Trade Secret Act when Cydan's misconduct occurred, none of the Hempels' common law claims against Cydan are preempted.

"Maryland applies the rule of *lex loci delicti* to determine the applicable law in tort cases." *Chattery Int'l, Inc. v. JoLida, Inc.*, No. CIV. WDQ-10-2236, 2012 WL 1454158, at *3 (D. Md. Apr. 24, 2012). Under that rule, Maryland courts apply the law of the state "where the injury—the last event required to constitute the tort—occurred." *Lab. Corp. of Am. v. Hood*, 395 Md. 608, 615 (2006). Misappropriation occurs where the misappropriated information is received and used, not necessarily where it was taken or where the economic harm is felt. *RaceRedi Motorsports, LLC v. Dart Mach., Ltd.*, 640 F. Supp. 2d 660, 666 (D. Md. 2009).

Misappropriation is the use of information "by improper means or through breach of a confidential relationship." *Blake v. Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 393 (D. Mass. 2012). As the Restatement of Unfair Competition explains, "misusing" a trade secret is a broad concept:

> There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret . . . As a general matter, *any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use'* under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, *relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute 'use.'*

Restatement of Unfair Competition § 40 cmt. c (emphasis added).

Here, Cydan misused the Hempels' Protected Material in Massachusetts. Cydan was head-quartered in Massachusetts. AC ¶ 17. In Massachusetts, Cydan developed its scheme to use the Hempels' Protected Material, covertly collaborated with NIH researchers it knew had access to the Hempels' Protected Material, solicited investors by reference to the Hempels' Protected Material, organized Vtesse by reference to that Protected Material, and decided to move ahead with its venture without the Hempels. *Id.* ¶¶ 69-81. Similarly, Vtesse was the brainchild of Cydan executives, who devised the venture in Massachusetts and misused the Hempels' Protected Material for Vtesse's benefit in Massachusetts. Thus, aspects of Vtesse's misuse of the Hempels' Protected Material may have occurred in Massachusetts as well.

To the extent Cydan and Vtesse misused the Hempels' Protected Material in Massachusetts, Massachusetts trade secret law likely applies. And Massachusetts did not adopt the Uniform Trade Secrets Act until October 1, 2018, approximately five years after Cydan's misconduct occurred. Accordingly, none of Plaintiffs' tort and equitable claims under Massachusetts law are preempted.

Ultimately, because the facts related to Defendants' misuse of the Hempels' Protected material lies primarily in Defendants' possession, discovery is necessary before the court can determine which law governs the underlying claims. *Chattery Int'l, Inc.*, 2012 WL 1454158, at *3.

**B. MUTSA Does Not Preempt the Hempels' Claims Arising Under Maryland Law.**

Contrary to Defendants' assertions, MUTSA does not preempt all Maryland state law claims that arise from a factual circumstance possibly involving a trade secret.

As an initial matter, Maryland courts decline to consider MUTSA preemption at the pleading stage. *See Telogis, Inc. v. InSight Mobile Data, Inc.*, No. PWG-14-563, 2014 WL 7336678, at *5 (D. Md. Dec. 19, 2014); *see also Allstate Ins. v. Warns*, No. CCB-11-1846, 2012 WL 68179, at *8 (D. Md. Feb. 29, 2012); *Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 802 (D. Md. 2002).

23

In any event, to the extent any of the Hempels' claims arise under Maryland common law, those claims are not preempted by MUTSA unless they necessarily involve trade secrets. The Supreme Court of Wisconsin—the highest court to have addressed this question—found that the Uniform Trade Secret Act does not preempt any causes of action that do not require misuse of a statutorily defined trade secret. *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 789-90 (Wis. 2006). Maryland courts have reached the same conclusion. *See Telogis*, 2014 WL 7336678, at *5; *see also Swedish Civil Aviation*, 190 F. Supp. 2d at 802. Here, Defendants had duties of loyalty, confidence, and good faith to the Hempels, and breached those duties by unfairly diverting the intrathecal cyclodextrin opportunity to Vtesse. Those claims do not require proof of statutorily defined trade secrets. Thus, they are not preempted. *See, e.g.*, *Telogis, Inc.*, 2014 WL 7336678, at *5 (holding that unfair competition claim for misuse of "Confidential Business Information" was not preempted by MUTSA); *Structural Pres. Sys., LLC v. Andrews*, No. CIV.A. MJG-12-1850, 2013 WL 3820023, at *5 (D. Md. July 23, 2013) (concluding that "claims based on Proprietary Information that is not a MUTSA trade secret . . . are not preempted by the MUTSA").

For their part, Defendants misleadingly say that the court in *Allstate Insurance* "favorably cited" the view that UTSA statutes preempt all claims based on misappropriation of confidential business information. That is incorrect. *Allstate* noted that there is a split among courts, and "decline[d] to decide the scope of MUTSA preemption." *Allstate Ins.*, 2012 WL 68179, at *8. And, notably, Maryland courts have rejected Defendants' position. *See, e.g.*, *Telogis, Inc.*, 2014 WL 7336678, at *5; *Structural Pres. Sys., LLC*, 2013 WL 3820023, at *5. As in *Allstate*, the preemption question is best left for another day.

### C.    The Hempels Have Stated Common Law Claims.

### 1.    The Hempels Have Stated a Claim for Breach of Fiduciary Duty.

The Hempels have stated a breach of fiduciary claim for Cydan's breach of their informal joint venture agreement. A joint venture is an informal partnership regarding a single enterprise. Whether parties are in a joint venture "depends upon the intention of the parties and every case must stand upon its own merits." *Las Vegas Machine & Eng'g Works, Inc. v. Roemisch*, 67 Nev.

1, 9 (1950). It is axiomatic that coventurers "owe one another the duties of loyalty, good faith, honesty, and full disclosure." *Nichols v. Findlay Auto. Grp., Inc.*, No. 2:12-CV-00093-MMD, 2013 WL 761947 at *4 (D. Nev. Feb. 26, 2013); *see also Shain Inv. Co. v. Cohen*, 443 N.E.2d 126, 131 (Mass. Ct. App. 1982) (same). "[A] coventurer may not acquire and retain for him- or herself any private or secret advantage in connection with the common enterprise." 46 Am. Jur. 2d *Joint Ventures* § 34.

*Nichols* is directly on point. In *Nichols*, the plaintiff alleged the parties met, "discuss[ed] working together to develop and promote an opportunity," and the defendant "followed-up the meeting with an email" noting that the defendant "was 'looking forward to developing this opportunity together.'" *Nichols*, 2013 WL 761947, at *4. The plaintiff also alleged the parties subsequently collaborated to develop a website and the "details of the advertising campaign to be used with the concept." *Id.* Thereafter, the defendant created a directly competing product in violation of the parties' relationship. *Id.*

The same thing happened here: Cydan solicited a confidential relationship with the Hempels, and met with them to discuss a joint venture for NPC. Following that meeting, Cydan requested access to the Hempels' Protected Material and asked the Hempels to make introductions to advance their joint venture. After gaining access and assistance from the Hempels, Cydan touted its enthusiasm about the venture over the course of five months, ultimately confirming that they were "moving forward" with their joint venture. AC ¶ 77. Cydan then betrayed the collaboration by forming Vtesse, in secret, denying the Hempels any benefit from the jointly-developed enterprise. *Id.* ¶¶ 81-86.

In response, Defendants argue that the Hempels' claim should be dismissed because "Maryland courts generally do not recognize breach of fiduciary duty as a standalone tort." *Knight v. Mfrs. & Traders Tr. Co.*, 84 F. Supp. 3d 436, 445 (D. Md. 2015) (DM 15).

Defendants' argument has two fundamental flaws.

*First*, Defendants assume Maryland law applies, but it does not. The Hempels, a Nevada-based family, had a fiduciary relationship with Cydan, a Massachusetts company. Cydan's

misconduct occurred entirely in Massachusetts. Thus, Maryland joint venture law—to the extent it conflicts with the law of Nevada and Massachusetts—is immaterial. *Precon Corp. v. G & B Envtl., Inc.*, 103 F.3d 119 & n.4 (4th Cir. 1996) ("[T]he law of the jurisdiction where the contract was made controls its validity and construction." (quotation marks omitted)).

*Second*, it is not true that Maryland would not recognize a claim for Cydan's breach of loyalty to the Hempels to the extent a joint venture was formed. Under Maryland law, as with the law of virtually other American jurisdiction, "joint venturers owe each other the duty of loyalty and fair dealing." *Walrath v. Cushing*, 150 A.2d 239, 240 (1959). Defendants breached that duty by self-dealing. And they must disgorge their improper gains to Plaintiffs.

### 2.     The Hempels Have Stated a Claim for Unfair Competition.

Regarding unfair competition, Defendants again incorrectly assume that Maryland law applies. DM 15 (citing *Sprint Nextel Corp. v. Simple Cell Inc.*, 248 F. Supp. 3d 663 (D. Md. 2017), which applied Maryland law). Rather, as detailed *supra* at 19-20, Massachusetts law likely applies to Cydan's misconduct. In any event, Plaintiffs are not aware of any meaningful difference between Maryland, Massachusetts, or any state's common law regarding unfair competition.

"What constitutes unfair competition in a given case is governed by its own particular facts and circumstances . . . [with] the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Sprint Nextel*, 248 F. Supp. 3d. at 686-87. An act constitutes unfair competition if it "substantially interferes with the ability of others to compete on the merits of their products or otherwise conflicts with accepted principles of public policy." *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F.Supp.2d 675, 692-93 (D. Md. 2012). "'It is impossible to state a definitive test for determining which methods of competition will be deemed unfair in addition to those included in the categories of conduct described in the preceding Comments. Courts continue to evaluate competitive practices against generalized standards of fairness and social utility.'" *Id.* at 692 (quoting Restatement of Unfair Competition § 1). "In assessing the propriety of the actor's conduct, a primary consideration is the social utility of the conduct as a means of competition." Restatement of Unfair Competition § 1 cmt. g. There

is obviously no social utility in permitting venture capital firms to take the ideas and labor of entrepreneurs and exploit them for their personal gain.

Defendants argue that Plaintiffs had "no business to damage or jeopardize—they had formed no corporation, and they sold no products." DM 15. The irony of that argument is rich: the Hempels had no corporation or products because Cydan misappropriated their Business Plan, their Protected Material, and commercial opportunity for themselves. The Hempels' product did not exist because Cydan took it.

Citing *Sprint Nextel*, Defendants suggest that unfair competition claims "generally rely on allegations of 'fraud and deception,'" DM 15, but they conspicuously omit the second half of the quote, which notes that fraud and deception "are not strictly required." *Sprint Nextel*, 248 F. Supp. 3d. at 686-87. In any event, Cydan obviously engaged in deception and unfairness. After gaining access to the Hempels' Protected Material, Cydan improperly took advantage of that data in breach of express and implied promises of confidentiality and redirected that commercial opportunity to its own investors, all the while misrepresenting to the Hempels that Cydan was moving forward with the joint venture. AC ¶¶ 76-79. Such misconduct is deceptive and grossly unfair.

### 3.    The Hempels Have Stated a Claim for Unjust Enrichment.

"Unjust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Santagate v. Tower*, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005) (internal quotation marks and citations omitted). The elements of a claim for unjust enrichment are (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention in-equitable. *Sweeney v. DeLuca*, No. 042338, 2006 WL 936688, at *8 (Mass. Super. Ct. Mar. 16, 2006).

Defendants make the half-hearted claim that they were not unjustly enriched because there was a Confidentiality Agreement between Cydan and the Hempels. DM 16. Notwithstanding De-fendants' argument that the Confidentiality Agreement is unenforceable, it is also immaterial

because the Hempels have not alleged a direct contractual relationship between themselves and Vtesse, Sucampo, or Mallinckrodt. To the extent the Court concludes those corporations did not ratify or adopt the Confidentiality Agreement, then the Hempels' unjust enrichment claims against those companies is not affected.

### 4.     The Hempels Have Stated a Claim for Tortious Interference.

To state a claim for tortious interference a plaintiff must allege that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *Draghetti v. Chmielewski,* 416 Mass. 808, 816 (1994). Each of the elements is alleged.

The Hempels allege that they had express and implied agreements of confidentiality with the NIH and its researchers that proscribed the competitive use of the Protected Material. AC ¶¶ 40-42, 45 & 91. And the Hempels allege that Defendants had knowledge of those express and implied agreements because the same researchers with whom they negotiated and agreed ultimately sat on Vtesse's board of scientific advisors. *Id.* ¶¶ 90 & 103. Finally, the Hempels have alleged that Defendants intentionally disrupted those contractual relationships by inducing those NIH researchers to improperly disclose the Hempels' Protected Material and improperly use research founded on the Hempels' Protected Material to compete against the Hempels' commercialization efforts, and that the Hempels were harmed by Defendants' wrongful actions. *Id.* ¶¶ 103-04 & 106-07.

## IV.   VTESSE, SUCAMPO, MALLINCKRODT, AND CYDAN II ARE LIABLE.

### A.     Vtesse, Sucampo, and Mallinckrodt Knew or Should Have Known They Were Benefitting from Cydan's Misappropriation.

A party may be liable for misappropriation or other usurpation of a business opportunity where it knew or had reason to know it was receiving or benefitting from misappropriated trade secret information or other wrongful conduct. *See Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 551-53 (1997); *see also PMC, Inc. v. Kadisha*, 93 Cal. Rptr. 2d 663, 669-79 (Cal. Ct.

App. 2000) (holding investors of a corporation liable for misappropriation even though trade secret misappropriation began before their investment); 2-7 Milgrim on Trade Secrets § 7.02[2][c] ("There is apt to be imputation of knowledge to the second user where it is a corporation organized by persons subject to a duty of secrecy to the first user." (citing cases)). Intentionally soliciting disclosure of trade secrets from third-parties under obligations of non-disclosure is misappropriation. *See Colgate-Palmolive Co. v. Carter Prods., Inc.*, 230 F.2d 855, 865 (4th Cir. 1956).

Here, Vtesse, Sucampo, and Mallinckrodt knew or should have known that they were benefiting from Cydan's misappropriation.

*Regarding Vtesse:* A promoter's knowledge is imputed to a corporation if the promoter becomes a director. *See Bates v. Cottonwood Cove Corp.*, 84 Nev. 388, 391-92 (1968); *cf. USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1217-18 (D. Nev. 2011). And "[i]t is well-established that, if a later formed legal entity accepts benefits from earlier offenses, it may be liable for those offenses." *Seibold v. Camulos Partners LP*, No. Civ.A.5176, 2012 WL 4076182, at *22 n.210 (Del. Ch. Sept. 17, 2012); 1A Fletcher, *Cyclopedia* § 218 (same).

Here, Vtesse knowingly accepted the benefits of Cydan's misconduct because Cydan executives with knowledge of the misappropriation—Adams and Csimma—sat on Vtesse's board. AC ¶ 84. Moreover, prior to Vtesse's formation, the Hempels were the only people in the world who had collected a comprehensive data set regarding intrathecal treatments of cyclodextrin, which was the foundation of Vtesse's enterprise. It is implausible that Vtesse would dedicate its venture to developing an intrathecal cyclodextrin treatments, and that Vtesses's investors would invest millions in the development of VTS-270, without realizing that they were benefiting from the unauthorized use of the Hempels' Protected Material. Indeed, Vtesse's promotional materials *included photos of the Hempel Twins. Id.* ¶ 86.

*Regarding Sucampo and Mallinckrodt*: It is implausible that Sucampo would purchase that asset for $200 million, and that Mallinckrodt would purchase the asset for hundreds of millions more, without realizing that they were benefiting from the unauthorized use of the Hempels' Protected Material. Surely the Confidentiality Agreement would have been disclosed during due

diligence of a $200 million transaction. And Sucampo retained Vtesse employees who were intimately aware of the source of Vtesse's research, *i.e.*, the Hempels' Protected Material.

Moreover, the Hempels initiated this lawsuit months before the Mallinckrodt closed its acquisition of Sucampo. Thus, when both Sucampo and Mallinckrodt came into possession of VTS-270, they knew that it was subject to a claim of misappropriation.

Accordingly, Vtesse, Sucampo, and Mallinckrodt are liable for the misappropriation Cydan initiated because they ratified and benefited from it.

**B.      Sucampo, Mallinckrodt, and Cydan II Are Liable as Successors.**

A successor is responsible for the liabilities of its predecessor when (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor. *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 556 (2008) (internal quotation marks and citation omitted).

More specifically, in determining whether a *de facto* merger has occurred, the courts consider various factors, including "whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." *Id.* at 557. "No single factor is necessary or sufficient to establish a de facto merger." *Cargill, Inc. v. Beaver Coal & Oil Co.*, 424 Mass. 356, 360 (1997). The facts are considered, with the objective of "properly balanc[ing] the successor corporation's rights to be free from liabilities incurred by its predecessor, with the important interest involved in ensuring that ongoing businesses are not

30

able to avoid liability by transferring their assets to another corporation." *Vill. Builders 96, Ltd. P'ship v. U.S. Labs., Inc.*, 121 Nev. 261, 269 (2005).

Sucampo plainly meets the criteria as a successor to Vtesse. After acquiring 100% of Vtesse's stock, Sucampo hired all of Vtesse's employees, fired Vtesse's chief executive officer (but hired him as a consultant to Sucampo), and subsumed Vtesse's assets and its employees into its operations, moving Vtesse from its offices in Gaithersburg, Maryland, to Sucampo's headquarters in Rockville, Maryland. AC ¶¶ 19-20 & 110-15. Thereafter, Sucampo touted VTS-270 as its own asset in public filings and public statements and referred to Vtesse as VTS-270's "former owner." Declaration of Joshua L. Seifert, dated April 23, 2018, ECF No. 40 ("First Seifert Decl."), Ex. 4 at 2; *see also id*. at 1 (referring to VTS-270 as part of the Sucampo "portfolio"). Thus, Sucampo's acquisition of Vtesse constituted a *de facto* merger, and/or Sucampo was a mere continuation of Vtesse's operations. By implication—if not expressly—Sucampo agreed to assume the liabilities, and jurisdictional contacts, of Vtesse.

Mallinckrodt similarly constitutes the successor to Sucampo. Less than eight months after Sucampo acquired VTS-270, on December 26, 2017, Mallinckrodt announced that it had entered into an agreement to acquire Sucampo's four primary assets, one of which was VTS-270. AC ¶¶ 121. A month after this action was originally filed, the transaction closed for $1.2 billion. Mallinckrodt announced that it had acquired Sucampo, "including its commercial and development assets." *Id.* After the acquisition, Sucampo ceased to exist as an independent entity. *Id. Id.* ¶ 122. Indeed, Sucampo shareholders received shares of Mallinckrodt in exchange. *Id.* ¶ 123. Moreover, Vtesse became a mere department within Mallinckrodt. Vtesse has no actual or projected revenues or income streams, and is funded entirely by Mallinckrodt. *Id.* ¶ 124. Indeed, Mallinckrodt's website identifies VTS-270 as one of its pipeline products, but does not mention Vtesse. *Id.* And, all of Sucampo's and Vtesse's records are now maintained by Mallinckrodt as part of its regular course of business. *Id*. ¶ 125.

Finally, the conversion of Cydan to Cydan II constituted a *de facto* merger and mere continuation of Cydan. One month after orchestrating the sale of Vtesse to Sucampo for $200 million,

31

Cydan formed Cydan II on May 10, 2017. AC ¶ 116. Cydan II has essentially the same investors as Cydan,[6] and was created for the specific purpose of "continuing the mission of Cydan, Inc." *Id.* ¶¶ 116 & 119. Thus, Cydan II was expressly formed as a "continuation of the enterprise" with Cydan and with a "continuity of shareholders." *Vill. Builders*, 121 Nev. at 268; *see also Milliken & Co.*, 451 Mass. at 557-58 ("In essence, the purchasing corporation is merely a 'new hat' for the seller."). Following the formation of Cydan II, the Cydan website converted references to "Cydan Development" into references to "Cydan II." AC ¶¶ 118-20. Cydan appears, effectively, to have ceased its operations following the formation of Cydan II. *Id.* ¶ 120.

Finally, details concerning the relationship between Cydan and Cydan II are exclusively in Defendants' possession. Thus, discovery is warranted to determine, for example, the extent to which Cydan II assumed liabilities and obligations for Cydan; the extent to which Cydan II bought out the interests of Cydan; and the extent to which Cydan II assumed Cydan's employees and business operations. In any event, there is a *prima facie* basis upon which to find the relationship between these two created successor liability.

## V.   LEAVE TO AMEND SHOULD BE FREELY GRANTED.

Under Rule 15(a), leave to amend should be freely given. "The Court only should deny [amendment] if amendment would prejudice the opposing party, reward bad faith on the part of the moving party, or would amount to futility." *Craighead v. Full Citizenship of Md., Inc.*, No. CV PX 17-595, 2017 WL 3334852, at *1 (D. Md. Aug. 4, 2017) (quotations and citations omitted).

Here, Plaintiffs amended their complaint voluntarily, not to cure any deficiencies, but to sharpen and update the allegations in light of the transfer from Nevada to Maryland and the addition of Mallinckrodt as a defendant. Since that time, Plaintiffs have uncovered additional evidence supporting their claims, and leave to amend would be warranted if the Court were to grant some or part of Defendants' motion to dismiss. For example, Defendants' production indicates:

- ████████████████████████████████████████████

---

[6]     Cydan and Cydan II have only one different investor. *See* First Seifert Decl. Ex. 5 at 1-3.



Plaintiffs are continuing to develop the facts, but the documents disclosed to date tend to validate the Hempels' claims, including that in breach of a confidentiality agreement, Defendants misappropriated the Hempels information and used it in ways that they were not permitted to do,

that Defendants unfairly competed with the Hempels' development efforts, and Defendants assumed and then breached duties to partner with the Hempels if they wished to pursue their investment in cyclodextrin. Defendants did so willingly and deliberately, time after time acknowledging, considering, and reviewing the obligations to the Hempels. And Defendants profited handsomely for their unfair and contractually-improper conduct. To the extent that the Court grants Defendants' motion to dismiss, leave to amend—to cure any grounds for dismissal—should be granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied. To the extent the Court grants any portion of Defendants' motion, the Hempels seek leave to amend to cure any deficiencies identified by the Court.

DATED: May 15, 2019

_____ /s/ Jonathan Biran _____
Jonathan Biran (Bar No. 28098)
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, PC
100 Light Street
Baltimore, MD 21202
(410) 862-1073
(410) 547-0699
jbiran@bakerdonelson.com

Joshua L. Seifert, Esq.
Pro Hac Vice
JOSHUA L. SEIFERT PLLC
175 Varick Street
New York, NY 10014
(646) 470-2647
jseifert@seifertpllc.com

David Slarskey, Esq.
Pro Hac Vice
SLARSKEY LLC
800 Third Avenue, 18th Floor
New York, NY 10022
(212) 658-0661
dslarskey@slarskey.com